IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SHAWN D. MERKE | : CIVIL ACTION |
| | : |
| | : |
| vs. | : |
| | : NO. 12-6995 |
| LOCKHEED MARTIN, et al. | : |

KEARNEY, J.                                                                        MARCH 18, 2015

## OPINION

A race discrimination in employment claim requires that race play a role in the alleged adverse employment decision. Retaliation requires at least some protected activity. Otherwise, an at-will employee, regardless of his race, is not guaranteed a new job with his long-time employer when it changes a business model affecting Caucasian and African-American employees equally. Plaintiff Shawn Merke ("Merke"), a fifty-four (54) year old African American man, repeatedly admits that, until his subjective beliefs in this case, he never mentioned race affecting his over 29 years of employment with Lockheed Martin ("Lockheed"), including to his former supervisor, Gretchen Peacock ("Peacock")(collectively, "Defendants"). Merke is understandably aggrieved because he was unable to find a new position in Lockheed after it changed the business model. He subjectively believes that Lockheed and Peacock did not like him, and does not believe there is any reason other than race for why he did not find a new internal position after Lockheed eliminated his long-time position as part of a new business model. But he cannot point to a scintilla of evidence of race-based motivation. As the material

facts regarding the adverse employment result are not disputed, we enter summary judgment in favor of Defendants in the attached Order.

## I.     UNDISPUTED FACTUAL BACKGROUND[1]

### *Merke enjoyed a long career with Lockheed.*

Merke, holding college and post-graduate degrees from Lehigh, Villanova and Penn, enjoyed an almost 30 year career as an engineer with Lockheed, attaining increasing levels of responsibility and managerial roles. (ECF Doc. No. 1, 6 at ¶12). Since 2004, Merke was a Senior Engineering Manager. (ECF Doc. No. 1, 6 at ¶12)  Merke claims that, in 2010, Lockheed awarded its Celebration of Excellence Award to him for leading a campaign to obtain a $100 million contract.  (SOF at ¶117).

Lockheed employed Merke in its Spatial Solutions ("S2") business unit in Valley Forge. (SOF at ¶3.) Since approximately 2010, the S2 unit contracted from a $1 billion to a $600 million business.  (*Id.* at ¶4, ¶75)  The engineering work decreased. (*Id.* at ¶5).  To gain work, S2 began low-bidding contracts using more junior-level engineers. (*Id.* at ¶29).  The economic reality adversely affected all senior engineers since they did not have sufficient billable work. (*Id.*)  S2 decided to restructure its business model.  (*Id.* at ¶4).

### *Changes in the S2 business model through Peacock affect Merke.*

As part of the restructuring, Peacock became acting Technical Director of S2 in May 2011 and Merke's manager.  (*Id.* at ¶¶ 44, 45).  By September 2011, Lockheed appointed Peacock as S2's Technical Director. (*Id.* at ¶50).

In July 2011, Merke and Peacock spoke at length about Plaintiff's career aspirations and the possibility of Merke becoming more involved in sales and marketing. (*Id.* at ¶60;

---

[1] The Court's Policies require filing of a Statement of Undisputed Facts and Response, referred to herein as "SOF".

Defendants' Appendix, ECF Doc. No. 51, "App." at 44:10-16).  Peacock reported in Merke's 2011 interim performance report that Merke "made good improvements in his communication and coordination with the Directors and PMs he supports in the [Line of Business].  He should continue to focus on and improve in this area during the second half of the year.  He should also continue to focus on 'soft' management skills, focusing on how communications to his team are received, focusing on a less aggressive approach where appropriate." (SOF at ¶56).

In December 2011, Peacock communicated to Merke that it would be plausible for him to move into a sales and marketing role, but he would not be able to take a sales role and remain a Senior Engineering Manager. (*Id.* at ¶63, App. 30:6-17; 31:12-32:3).  Merke agreed to join Peacock's technical team, and then Peacock posted a requisition for his former, now "re-scoped" Senior Engineering Manager position. (*Id.* at a¶66).  Merke retained the job code of Systems Engineering Senior Manager, and continued to be coded as a manager even though he no longer had direct reports. (*Id.* at ¶65).  Merke did not apply for his former now re-scoped position when reposted in December 2011. (*Id.* at 67, App.71:4-16, 71:13-16).

Merke concedes that as a member of Peacock's technical staff, he needed to find billable work. (*Id.* at ¶70).  Peacock tried to assist Merke, in at least August, 2011 and January 2012, in finding a new position at Lockheed. (*See* Def. Exhibits in support of his Motion for Summary Judgment, ECF Doc. No. 36, at B-5, tabs 5, 8, Merke 6/4/13 N.T. at Exh. Merke 5, Merke 8).

### *Lockheed's Watts' reorganization efforts affect Merke.*

In early 2012, Lockheed appointed Sharon Watts ("Watts") as S2's Vice President to implement another reorganization.  (SOF at ¶¶73, 75). As part of Watts' reorganization, Lockheed required many employees to be laid off. (*Id.*).  Peacock and her team implemented the position eliminations within S2's engineering function. (*Id.* at ¶77-79).

On April 25, 2012, Watts held a regional "All Hands Meeting" at Valley Forge to discuss her future plans for S2. (*Id.* at ¶80). Merke claims he was sitting in the front rows at that meeting, and Peacock approached him, telling him that the seats were reserved for the senior team and implied that he should move. (Merke N.T. 7/19/13 at p. 512) After this meeting, Peacock and Merke had their own meeting the same day. (*Id.* at ¶81). Peacock explained to Merke that because of the lack of funded assignments, they needed to find him a new position. (App. 122:13-123:9). Merke understood that if he didn't find work, he would risk losing his job. (SOF ¶82). According to Merke, he questioned why Peacock was, in his opinion, "not delivering on what she promised" with regard to helping him find a new direction for his career. (App. 51:19-52:3).

Merke does not dispute that he never said anything to Peacock either at the April 25, 2012 meeting or at any other time that he believed he was being singled out <u>because of his race</u>.[2] Although Merke claims he complained to Peacock generally because she wasn't "delivering on what we had talked about . . ." other than Merke's subjective belief, there is no evidence or testimony to support that such complaints were somehow linked to race. (App. 59:23-61:13).

> Q.    Did you think that these actions that Gretchen was taking – taking were
>       somehow related to your race?

By Merke:  Yes.

> Q.    As of January 18, 2012, you thought that these actions were somehow
>       Related to your race?

By Merke:  Yes.

---

[2] Merke's counsel admitted during oral argument that there were never any complaints or protests by Merke *about race.*

Q.      And what did you base that on?

By Merke:  Well, there was a tension from the day we met…I – I just felt like
           this – this person didn't like me, found fault with things I did, said.
           For what  reasons, I – I didn't know…

                        * * *
           The fact that she was presenting to me what I deem to be some
           judgmental behaviors, and that was a part of our discussion.  We
           talked about numerous things, but I – I resented the fact that she
           was telling me about – she was talking to me about me and she
           didn't know me.  The only thing she knew about me was that I was
           black.

(Merke N.T. 6/4/13 at p.368-73, App. 37:18-39:19;41:20-42:4).

Q.      Okay.  Did – did Gretchen [Peacock], in any of your interactions with
        Gretchen, after you first met her in person, as the acting director in 2011,
        up to your date of layoff, did Gretchen ever say anything to you that was
        racist?

By Merke:  She never said anything.

(Merke, N.T. 6/4/13 at p. 400; App. 52:18-24).

Q.      And other than what you've previously mentioned, are there any other
        factors that caused you to think that she reneged on the agreement
        because of your race?

By Merke: Yes.

Q.      What are those other factors?

By Merke: I was being, uhm, prejudged and I was being, uhm, one might  say,
          evaluated unfairly in my eyes, uhm, with no plausible reason or
          rationale provided to me…

(Merke N.T. 6/4/13 at 391, App. 47:2-13)

By Merke:  Every little thing that I did when I was in – in her presence just
           wasn't acceptable.  And there's no reason for that.  I – I tried to
           maintain being a professional at all times in what I think was a
           stressful environment already, and there's – there's no – I can't – I
           just can't come up with any reason why she felt the way she did to
           me and behaved.  So it was her behavior.  You keep saying what did
           she say…..No, it's how I felt.

(Merke, N.T. 6/4/13 p. 426; App. 59:12-60:4)

> By Merke:  … it's a very difficult thing for me to accept that this woman wouldn't have thought I was competent and capable to do the job, what comes down to me is because of the color of my skin, because she had no other justification.

(Merke N.T. 7/19/13 at 427, 477; app. 64:17-24)

Merke confirmed during deposition that he never mentioned anything to anyone at Lockheed about being discriminated against because of race:

> By Merke:…   I didn't complain to anybody. I didn't go to anyone in that company and tell them what kind of nonsense this woman was putting me through…

(App. 48:1-110).

> By Merke:  …I'm going to say this again…I never went to anyone in that company and said anything about racism.  What I went to them with is [Peacock] is not doing what she promised to do, I need your assistance to find a new job.

(App. 52:8-17).

> Q:  And I think you testified that at no time did you complain to [HR manager] Barbara Harmon that you felt that Ms. Peacock was discriminating against you because of your race; correct?
>
> By Merke:  Correct.

(App. 55:21-56:2).[3]

---

[3] Merke states that he tried to call Human Resources to report a claim, but never actually spoke to anyone.  Merke also states that he attempted to call the ethics department, but never got through.  As Merke admits that Lockheed never had notice of these contacts, the Court finds these attempts are not credible evidence of protected activity.

*Notice of Merke's layoff.*

On May 10, 2012, Peacock sent Merke a 30-day Notice Memorandum advising that his assignment would be ending and that they needed to find another assignment for him to avoid layoff. (SOF ¶84). Lockheed advised Merke that he would receive a 2 week notification of layoff on June 8, 2012, and be scheduled for layoff June 22, 2012,[4] unless he found a new assignment before then. (*Id.* at ¶85). Peacock asked Merke to let her know when he applied to open positions so she could contact hiring managers on his behalf. (*Id.* at ¶88). Merke claims that Peacock "rebuffed inquiries on his behalf." (*Id.*). Email correspondence to Peacock on June 11, 2012 from Noon Elrayah, inquiring about Merke read:

> From: Elrayah, Noon
> To:    Peacock, Gretchen W
> Date:  June 11, 2012
> Subject: FW: shawn merke seeking work opportunity
>
> Any info you can shed on Shawn's situation. What is driving the June 22nd date?

The reply:

> From: Peacock, Gretchen W
> Date:  June 11, 2012
> To:    Elrayah, Noon
> Subject: RE:  shawn merke seeking work opportunity
>
> It is an extremely long story. Probably best to discuss in person. But at a high level, his position was eliminated as part of the S2 reorganization. Barbara Harman also has all the information.

When asked by Elrayah as a follow up on June 19, 2012 whether Merke had found anything, Peacock replied:

> From: Peacock, Gretchen W

---

[4] Merke claims that because the notice was only twenty-nine (29) days, this is evidence of discrimination. As Merke has no evidence that the timing was racially motivated in any way, the Court finds no merit to this argument.

Date:    June 19, 2012
To:      Elrayah, Noon
Subject: RE: shawn merke seeking work opportunity

No. Again – long story. He's been out due to a death in the family (nephew) for 2 weeks now. . . . FYI: I have another employee with an assignment ending who also has a last day on Friday. I'm working with several managers to get him covered or he will be laid off on Friday. Is the special attention being paid to Shawn only because he wrote an email to TW?

(Pl. Memo.in Opp. to Summ. Judgmt. at Ex.A, ECF Doc. No. 40, Peacock Dep. Ex. 8)

Ultimately, Merke did not find a new full time position with the company, and he was laid off on June 29, 2012. (*Id.* at ¶¶ 89, 103). Lockheed cited Merke's overhead charges and lack of billable work to sustain his technical staff role, and the reorganization of S2, as the primary reasons for Merke's layoff. (*Id.* at ¶90). Merke claims Lockheed terminated him because of his race and in retaliation for protesting mistreatment based on race.[5]

## II.  LEGAL STANDARD

The legal standard governing motions for summary judgment is well-settled. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts. *Scott v. Harris,* 550 U.S. 372, 380 (2007), citing Fed. Rule Civ. Proc. 56(c). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts...Where the record taken as a whole could not lead a rational trier of fact

---

[5] During oral argument, the parties confirmed that Merke is one of four individuals given a termination notice shortly after the April 25, 2012 "All Hands Meeting." Of the four, two are African American, and two are Caucasian. All were offered the same opportunity to find a new position or suffer layoff. Two individuals found a new position at Lockheed and did not suffer layoff (one African American, one Caucasian), while Merke and one Caucasian employee did not find another position before their layoff date.

to find for the nonmoving party, there is no 'genuine issue for trial.'" *Id.*, citing *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.*, quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248 (1986); *Dee v. Borough of Dunmore*, 549 F.3d 225,229 (3d Cir. 2008). "Only disputed over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson* at 248.

At this summary judgment stage, the Court's function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. *Woods v. Pettine*, Civ. A. 12-5608, 2015 WL 1072687, at *3 (E.D. Pa. Mar. 12, 2015) Where a non-moving party fails sufficiently to establish the existence of an essential element of its case on which it bears the burden of proof at trial, there is no a genuine dispute with respect to a material fact and the moving party is entitled to judgment as a matter of law. *Tillman v. Redevelopment Auth. of the City of Philadelphia*, No. CIV.A. 12-1505, 2013 WL 5594701, at *3-4 (E.D.Pa. Oct. 11, 2013)(internal citation omitted) *aff'd*, No. 13-4424, 2015 WL 294638 (3d Cir. Jan. 23, 2015). Further, "[m]ore than a mere scintilla of evidence in its favor must be presented by the non-moving party in order to overcome a summary judgment motion."

## III.   ANALYSIS

Lockheed and Peacock argue that Merke's evidence is insufficient to state a *prima facie* case of discrimination based on either race or retaliation for engaging in protected conduct. Merke counters that there is sufficient evidence to support both of his claims.

9

### A. Discrimination based on race.

The parties agree that there is no direct evidence of discrimination, and therefore the framework set forth in *McDonnell-Douglas Corp. v. Green,* 411 U.S. 792 (1973) guides the analysis. *Id.* Merke must first establish a *prima facie* case of discrimination by showing by a preponderance of the evidence that he (1) belongs to a protected class; (2) was qualified for the position held; (3) suffered adverse employment action; and (4) the adverse employment action gave rise to an inference of race discrimination. *Tillman v. Redevelopment Auth. of the City of Philadelphia,* No 13-4424, 2015 WL 294638, at *1 (3d Cir. Jan. 23, 2015); *Anderson v. Consol. Rail Corp.,* 297 F.3d 242, 249 (3d Cir.2002). Only if the *prima facie* case is established does the burden shifting framework set out in *McDonnell Douglas Corp.* apply.

Merke satisfies the first and third prongs of a *prima facie* case, and for purposes of this motion, the Court will assume that Merke also meets the second prong. Merke's difficulty lies in the fourth prong. Merke's proffered evidence does not permit an inference that his layoff was based on unlawful race discrimination.

The sum of Merke's evidence is: (1) Merke testified that he felt tension from the day he met Peacock, felt that Peacock did not like him, and believed he was being evaluated unfairly with no plausible reasons or rationale; (2) in April 2012, Peacock required that Merke should move from his seat at regional meeting in front of an auditorium full of employees which, she claimed, was reserved for the senior team; (3) Peacock told him he was too aggressive, which Merke believes is another way of saying she didn't like him because he was African-American;

and (4) Peacock rebuffed inquiries regarding a possible new position for Merke on June 19, 2012.[6]

Merke's first point falls short of facts necessary to raise an inference of race discrimination. "An inference of race-based discrimination cannot arise simply from an employee's subjective belief that his or her race somehow influenced the challenged employment action." *Kier v. Lackland & Sons, LLC,* --- F.Supp.3d ---, 2014 WL 7192403 at *9 (E.D. Pa. Dec. 17, 2014), citing *Howard v. Blalock Elec. Serv. Inc.,* 742 F. Supp.2d 681, 702 (W.D.Pa. 2010); *see also Tucker v. Thomas Jefferson University,* 484 Fed. Appx. 710 (3d Cir. 2012)(subjective belief that race played a part in his termination is insufficient to meet the standard for a prima facie case); *Tillman, supra,* 2013 WL 5594701 at *8-9

Merke's other claimed evidence also does not suffice. *See Williams-McCoy v. Starz Group,* No. 02-5125, 2004 WL 356198 (E.D.Pa. 2004). Neither Peacock's statement asking Merke to give up a seat in the front of an auditorium, which she claimed belonged only to senior management, nor Peacock's alleged comments that Merke was "aggressive" can in this instance be construed as racially motivated. While Plaintiff may have been offended by those comments, there is no sufficient basis to permit an inference of racial animus. *Kier, supra* at *9, citing *Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 271 (2001)("Simple teasing, offhand comments, and isolated incidents (unless extremely serious)" do not alone amount to discrimination.) Finally, Peacock's response to the June 2012 emails from Elrayah cannot, without something more, be construed as racially discriminatory.

---

[6] During oral argument, Merke's counsel stated that even from their earliest meetings, he felt that Peacock did not like him. Merke claims Peacock's statement that he was too aggressive is a derogatory characterization "code" based on his race. Given that Merke never mentioned this "code" claim until this litigation, the Court finds these arguments do not defeat summary judgment.

The Court finds that Merke has not met the minimum quantum of evidence necessary to satisfy the fourth prong of a *prima facie* case of race discrimination. *See Tillman v. Redevelopment Auth. of the City of Phila., supra*, at *9 (E.D. Pa. Oct 11, 2013). "While the *prima facie* case is typically not an onerous burden, it is also not a meaningless standard that can be satisfied by unfounded suspicious of discrimination." *Kier, supra*, at *10. After extensive discovery, Merke's failure to meet the elements of a *prima facie* case obviate any further analysis or burden shifting under the relevant *McDonnell Douglas* standard. Summary judgment in Defendants' favor on the race discrimination claim is warranted.

## B. Retaliation

Plaintiff claims unlawful retaliation under Title VII, 42, U.S.C. §2000e-3(a), 42 U.S.C. §1981 and PHRA 43 Pa. C.S.A. §955(d). The analysis is the same under each framework. *Estate of Oliva v. New Jersey Dept. of Law & Public Safety*, 604 F.3d 788, 798, n.14 (3d Cir. 2010). A plaintiff asserting a retaliation claim first must establish a *prima facie* case by showing: (1) he engaged in protected activity; (2) the employer took adverse action against him either after or contemporaneous with the employee's protected activity; and (3) a causal link exists between the employee's protected activity and the adverse employment action. *Daniels v School Dist. of Phila.,*776 F.3d 181, 193 (3d Cir. 2015).

Merke cannot meet the first element of a retaliation claim. Merke unequivocally concedes that he *never* complained to anyone at Lockheed about being treated unfairly due to race. While Merke may have complained generally to Peacock her "not doing as she promised" with regard to his career development, there is no evidence of any complaint claiming different treatment or discrimination *based on race*. *Atkinson v. Lafayette College*, 653 F. Supp.2d 581,

595-6 (E.D.Pa. 2009)("general complaint of unfair treatment is insufficient to establish protected activity.")

Although Merke may have expressed concerns to Peacock that he was being treated unfairly, Merke admits that he never told anyone he believed he was treated differently because of his race. It is significant that in his nearly 30 years at Lockheed, Merke was admittedly well informed about Lockheed's policies and procedures for reporting allegation of race discrimination. Despite this awareness, Merke reported nothing. As there is no evidence of any protected activity sufficient to meet the first element of a *prima facie* case of retaliation, Defendants' motion for summary judgment on Merke's claim for retaliation is granted.

## IV.    CONCLUSION

Merke offers no evidence that would support a prima facie race discrimination or retaliation claim. Merke concedes that he never complained about race to anyone at Lockheed. After extensive discovery, Merke's failure to show a *prima facie* case under either race discrimination or retaliation theories mandates summary judgment dismissing each of Merke's claims.